Good morning, Your Honors. Marilyn Bednarski on behalf of the appellant. This is a case about a man who, at the time of his resentencing, had served nearly 10 years. He was resentenced to a sentence of 180 months, largely based upon the conduct of others. We ask in this appeal for the court to vacate the sentence of 180 months and remand for resentencing consistent with the guidelines N3553. And there are really two prongs to my argument. The first is that the guidelines were not calculated correctly. The second is that the sentence of 180 months was unreasonable in light of N3553. Whether or not they were calculated correctly, what they were calculated at was then departed downward by the district judge, right? He imposed a less-than-guideline sentence in the case. He did. He didn't call it departures, but he clearly went below. It was a low-end sentence. It was an actual less-than-guideline sentence. Right. I would say he calculated the guideline range to be at level 32 at a criminal history 5, which would have put the court at 188 to 235. And the sentence that I believe should have been calculated prior to reaching N3553, the sentence that I think he should have calculated the range at under the guidelines, was at least three levels less because it was not foreseeable, nor should Mr. Lye have been held accountable on a conspiracy theory for the Centon loss. That made a difference of three levels. Counsel, on the foreseeability issue, the problem I have with your argument is that Judge Hatter made it pretty clear on resentencing that he was finding, by clear and convincing evidence, that the display of the weapons, the flex cuffs, and all the other paraphernalia in the crew meetings before the robberies at which your client was clearly in attendance should make a finding that it was reasonably foreseeable a good finding. Don't we have to conclude that he clearly erred as a matter of fact before we can conclude that that legal determination is wrong? On the guns and restraints, I believe you have to find that he clearly erred in finding that the facts supported that the guns and restraints were foreseeable and therefore attributable to Mr. Lye. And what's your best argument that there is clear error in the face of this record? It seems to me that's an awful tough argument for you to make. And I want to answer that question. And let me say it's a different analysis as to loss because he made no finding of foreseeable. Okay. Let's do this one first. Then we'll get to the other one. All right. Let's do the hard one first. You know what? It's an interesting question because in some ways I think it's an easier one because the government had every opportunity at the resentencing to present more evidence, new evidence, anything else. But all we have is the trial record. The government's trial record is pretty strong. I mean, the judge listened to the testimony of the co-conspirators. I mean, what more did they need to show in order to support a reasonably foreseeable that they were going to, you know, tie up the victims, hold them at gunpoint, and then walk off with millions of dollars' worth of their inventory? First, I think that the government overstates the trial testimony by putting things in general terms and conclusory terms and makes it sound as if, well, there's no evidence that Mr. Lye was at a vantage point to have seen the things some other co-conspirators did. Did you challenge sufficiency of the evidence in the direct appeal? I mean, that's a Jackson argument, that there's just nothing in the record to support the jury's verdict that he participated in the crew meetings and the guns and weapons were displayed and so on. I got this case on remand for resentencing after the December 04 order. The direct appeal was done by someone else, and I don't know if ‑‑ I know that it was reversed by this court on ‑‑ here's the procedural history. Sohn Van Lye was convicted as well as one or two others. There was a direct appeal. He then challenged on a writ his sentencing. That writ went up to the circuit and resulted in the December 04 order that resulted in ‑‑ Sentencing is different from conviction. The question I'm asking you goes to the underlying conviction, and the question was did he appeal the sufficiency of the evidence under the Hobbs Act robbery count? He was ‑‑ Was that appeal rejected when his conviction was affirmed? In which case it seems to me that's law of the case and there isn't much we can do for you there. He was convicted of conspiracy, count one. He was convicted of a Hobbs Act robbery involving MIT, count three. Which wouldn't have required guns or ties. And he was not convicted of the Centon robbery as a Hobbs Act. That was count four, which was dismissed on a government's motion. The court then granted it. And he was not convicted of the 924C counts, which went both to MIT and to Centon. That was count six and seven. Those were rule 29. So what went up on appeal was ‑‑ I don't know if it was appeal, but what could have been appealed I suppose was sufficiency as to conspiracy. Under a Pinkerton theory? And I don't know if he was convicted on a Pinkerton theory or on a direct evidence theory. Well, I assume the jury was given a Pinkerton instruction. They may have been, and I don't know the answer to that. But Pinkerton liability does not apply to sentencing enhancements. No, but was there anything he was convicted of on direct appeal that required the use of a weapon? No. What occurred, and here's what I think happened, is that the trial occurred before Booker, Amoline, Blakely. No one was focused on sentencing enhancements. So it came up to this Court in 2004 on really an ineffective assistance of counsel claim on failing to challenge these enhancements, which resulted in 14 levels. It's kind of a tail wagging the dog on top of the base offense level of 20. When it came back, the government had every opportunity to present evidence at sentencing, whatever it could, to support its enhancements. It presented nothing on guns or restraints. Why would the government have to do that if the trial judge has already sat through the trial and listened to the direct testimony of the accomplices who testified to the crude meeting? And I agree that there's deference to the Court on credibility and things like that. But when I look at the underlying facts at the trial, I don't see strong evidence of those two things. I see weak evidence of those two things because essentially what they had is Mr. Van Lye being around at meetings that took place at hotel rooms prior to robberies where there were several participants, eight or nine, took place for several minutes, not lengthy meetings. He was not one of the planners or one of the people handing out. The question is, is there direct evidence that shows that he was in the room at the time the guns were there? There was evidence from possibly two or three. It's sometimes confusing because there are different robberies being talked about, but I'd say it's a fair summary of the evidence to say two or three accomplices turned cooperators who had said that they saw guns or restraints in a hotel room where at the same time other persons were present, including Van Lye. No one ever said he was in the same position I was in or he could have seen what I saw or he did see what I saw. It's clear that the people who saw the guns were the people who had guns. There were certain people whose role it was to hold the guns. Then that leads to the question. You have testimony from those two accomplices that say that the guns were in the room and Van Lye was in the room at some point when the guns were there, but they don't say he saw the guns. The question is, then the judge takes that evidence and says, I find by a preponderance of the evidence that he was aware of the guns. Very simple question about whether we can overturn that as clear error. Well, I think that the court had a generalized sense of the crime involved multiple participants who had weapons and they would take over robberies and there were multiple robberies. And I don't think that it was analyzed particular to Mr. Van Lye. And some of the facts that I think are very strong is that in a lot of the cases the government cites where they attach a kind of foreseeability aspect to things because they involve robberies or violent robberies. We don't have here like close relationships, very few participants, someone displaying a gun in a waistband that was very visible to other people. Did Judge Hatter find foreseeable or actual knowledge with respect to the guns and the ties? He sort of found both, really. He certainly found foreseeability with respect to the restraints and ties. And then he makes a comment. My recollection is, I'm a little skittish about recollections today, but my recollection is the judge says something about, I find he was aware of. I think he uses that word. And then if we could go back to the money, you don't really argue lack of foreseeability of the loss amount. The loss amount itself was stipulated, so the only point would be was it foreseeable that that would be the loss amount. Right. And what's your argument that it isn't? My argument that it isn't is, first, it's attenuated by the fact that he wasn't found guilty of that and, in fact, the account was dismissed against him. It's also attenuated by the fact that his lesser role in the case would support that, well, let me start with the premise that liability for conspiracy is not the same as liability for sentencing. And within liability for sentencing, it has to be based upon an analysis of what someone's role is and the extent of someone's participation and the nature of their agreement. Counsel, why wouldn't Judge Hatter be able to conclude that one of these robberies took 30 to 45 minutes or more to complete because they're loading all the inventory and your client was identified as one of the loaders carrying the computer parts back and forth to the getaway van and the testimony was that employees were being held at gunpoint and in restraints in the building at the time this was happening? Why couldn't he consider that as well as evidence of foreseeability or actual awareness? There were certain different people did different things in these conspiracies. It's clear from the evidence that my client was not involved in the first crew that went in, which was the job of that crew was to either restrain people or to, I guess, keep people from messing with their robbery. But he was present in the planning meetings where the roles of each of the crewmen were discussed and assignments were given by the crew leader as to what each person's role would be. Doesn't that support a foreseeability analysis? The problem I have with that is when such general language is used and not specific language as Mr. Van Lai, we're then talking about general roles of other persons. What is clear is that he was not a high-level person. He was not a planner, like some of the cases the government cites. He was not a person who ---- that at the planning meeting where roles and assignments were discussed, that he was present. What more does the evidence have to show to convince, to establish a record of foreseeability? Well, I think what we know is what his role was and what he did, and that was concrete. Because after the planning meeting, then the robbery occurs, at which he's placed by witnesses at the scene of the robbery. I'm having a real hard time with your argument. I don't know what more the government would need to show or what more the district court needed to hear to make this foreseeability determination. This seems to me to be a no-brainer. Am I approaching this in a too simplistic of a fashion? Well, he didn't make a foreseeability determination at all about loss. He made no factual finding about foreseeability of loss. What he did was accepted the agreement of the parties that the loss amount calculation was between $2.5 and $5 million. But from there, to get to impute on him a finding that the loss was attributable to him on some foreseeability theory. Loss amount. It is not in the record. There is no such finding, and it has to be remanded at least on that. And I don't believe the loss amount is, if you look at what his agreement was to do, which was a very low-level person to either drive or go and load boxes, not a manager, no evidence that he helped in making these plans, nothing other than, and I think even Judge Hatter talked about his role in the record as being a very minor player, a bit player. There's language that suggests that he saw him quite differently than others. There's no indication here that he shared proportionally any profits. There's no evidence, like some of the cases the government cites, where he's integrally involved in designing it or a very important player in the orchestration of it. But to buy your argument, we'd have to conclude that all we can look at is what he was paid as his share in the face of the evidence that this is a guy who's carrying the boxes of the stolen goods from the inventory room at the company to the getaway van and driving away with all the goods. And why is it unfair to tag him for the value or the foreseeability of the loss when he knows that they're targeting high-tech companies for valuable electronic inventory? Well, I don't think there's any evidence in the record that he has any knowledge of the value. He knows they're robbing warehouses, right? He knows he's carrying boxes. I thought he'd been involved in an earlier one in Minnesota where they tried to hit one of these big electronic companies. There were, I would say, there was evidence of the Centon robbery, MIT robbery, and a company called NEI, which was the one in Minnesota. The evidence of the Centon robbery – Was he arrested at that one, though? Wasn't he under the jurisdiction of the Minnesota courts at the time he committed this robbery? He was arrested at that one, and there was – and, again, it was in a van. There was no indication that anything was open. There was no indication of anything of value. It's the same MO, right? It's all part of the same course of conduct. All of these robberies are similar in the sense of – Doesn't that make it harder for us to say that Judge Hatter was wrong in finding foreseeability if he participated in multiple crimes that constitute a pattern under a common modus operandi? Yes, in terms of foreseeability in a higher loss amount than, say, the one he was convicted of, which was the MIT robbery. But to go from there to $2.5 million to $5 million in a robbery that he was not convicted of for a count that was dismissed against him, for which the judge made no factual finding that it was foreseeable, and to insert into the record that he must have thought it was foreseeable, it seems to me that we can't substitute our finding for what he should have done. What was the amount of the MIT robbery? About $390,000. There's no evidence that Mr. Van Lye ever knew that, but that's the evidence in the record is that – I think he'd be better off if there were. Then there might not be any reason for him to think the other robbery was $3 million. I mean, I think he was so low down. Yeah.  I mean, I think that's the answer to Judge Wilkins' question, that it's partially his role, it's partially that he was given instructions and only followed instructions. He wasn't involved in any planning. He wasn't a manager. He was merely a loader. Well, what do you think the rule is for foreseeability of knowledge of the value of the robbery? How do you know when somebody should foresee it? What – how do we tell that? Well, I think – I mean, suppose it turns out, suppose these – I don't know what this equipment even is, but high tech, that's enough for me. I wouldn't have any idea if it was $300,000 or $30 million or $3 million. What is it that makes the amount foreseeable? I would say that if someone is involved in the discussion of who are we going to rob and what's the nature of the business and why do we want to do it and this is what it's worth and this is how we're going to divvy up the profits, that person clearly has the knowledge from which someone could say, if you didn't know it exactly, certainly you could have foreseen it. When you have a person way down low, I would say on the other end of the spectrum, it's much harder to say that. We could guess it, well, he must have thought what's in the boxes was very valuable, but there isn't any evidence that evidence of value was presented to him. I understand Judge Tallman's argument that, well, it's computer warehouse. It's not an argument, it's a question. Yeah, I hope it's not an argument. I'll argue later. So you start arguing with everybody. Right now I'm just asking a question. You know, maybe you could say, well, something there would be more valuable than at a dog food store, you know, or, you know, some location where there would be an item of lesser value. But part of what's wrong with the guidelines, I would say, is that we have these arbitrary measures of culpability. Small part. What's that? Small part of what's wrong. We've taken you double time so far, so you might want to save a minute. Thank you very much. Good afternoon, Your Honors. May it please the Court. Elena Duarte appearing on behalf of the United States. Maybe you can answer my question. Is what we're talking about the foreseeability of the amount, and if so, how do you determine what was foreseeable to this defendant? I think that we're talking about two things, Your Honor. One was primarily argued. The other, as I think was pointed out, wasn't argued in the briefs as much. One is the actual loss amount itself, and as the Court pointed out, that was stipulated too. I want to point out that it was stipulated too. Is that what we're talking about? Is that all you need, the actual loss? The other is, of course, it does have to be foreseeable, and that's just the general jurisprudence. If I may, though, point out, Your Honor, something that I don't think came up before. I agree that the district court's particular findings on November 7, 2005, weren't very specific as to the actual foreseeability of the loss. He did, however, adopt the previous sentencing that he'd done before, and I don't think he needed to be, and the reason is this. You'll notice that the government came prepared to present about $10 million in loss and proffered its paperwork and proffered its evidence. At that point, there was a stipulation offered by defense that the government could indeed prove by clearing convincing evidence, and we went down at that point to $2.5 to $5 million. And there was a discussion, and I cite some of it in my brief, and it's in the record, as to the fact that that is in part a compromise. It's a compromise stipulation. And I think, and I'm in. It was an actual stipulation, sir. I'm sorry. How does that address foreseeability? Yes, ma'am. Compromise the amount and that lowered the guidelines to some degree, but that leaves foreseeability. Yes, ma'am. But the need to compromise, I think, was felt by all the parties, I hope I'm going to try to be clear, as to encompass the foreseeability and certainly the minor role. Because you'll notice it. But your witness was just, the witness that you didn't call was just the guy from the victim company that was going to come in to say, we tendered a $9.8 million claim to the insurance company, and they paid it. Therefore, the amount of the loss was $9.8 million. And your stipulation, which was quite generous, I thought, given the strength of the proof that you were ready to put on, takes care of the amount of loss. How does it address foreseeability? I think that it went downward in part because it was addressing minor role, which is addressed. And I don't think it did. It didn't address foreseeability. Here's what I'm saying. I'm saying that this may well have explained also the district court's lack of a very specific finding on foreseeability, is it was kind of assumed that that stipulation, by going so much lower by being so generous, wrapped up, if you will. At least I know I assumed it. I was there at the time. Kind of wrapped up the minor role argument that Ms. Bednarski was, you know, quite capably, of course, making at the time. And I think that that's why the district court's findings aren't more clear on that particular matter. You think it wrapped up the foreseeability of the loss as well? I think that that was the sentiment. I know that that's what I thought. Was there any discussion at any of the earlier he'd been sentenced twice before, was there any discussion at either of the previous ones about foreseeability of the loss amount? Only once before, Your Honor, I believe. Well, there was a proceeding. He wasn't actually sentenced, but they talked about it. And then the original sentence. Oh, there was a brief discussion in August. I think that what happened in August, and I have it here and I can check if you need me to, but I think that what happened in August, there was a little bit of argument, but Ms. Bednarski started out and she brought up the points that she made again later so eloquently, which had to do with his actual disadvantaged background and his possibly his lesser role. I would have to double check that. It is in the ER. Okay. But there's nothing about the foreseeability of loss amount that you could point to from that proceeding or from the earliest proceeding? No. No, Your Honor, not that I remember. However, we argued below in the papers, and we certainly argued multiple times, that the fact that he was actually loading the 19-foot U-Haul, which was there to haul away these computer parts in the Centon robbery, in the MIT robbery, which took place, I believe, 16 days prior. It was very close in time to the Centon robbery. He was convicted of MIT. There was very complete testimony below about how these victims were tied up, how they were strained inside. But how does he know the loss? How does he know the value? Did he tell the conspirators, oh, this is going to be a big one, we're going to hit millions in this one, or anything like that? Not that it's in the record. It's in the record that the crew chief received $150,000 to pass out, which is a lot of money, which was his portion from the higher-ups. And that's in the briefs. And the NEI robbery was subsequent? Yes. No, the MIT was first, and the Centon was subsequent. And then the NEI. Yes, yes, ma'am. And I point that out because there's actually much better in terms of the modus operandi. There's much better evidence in the record about MIT in terms of how these things were done, and he was convicted on that. Then we have two weeks later, Centon, and even though he wasn't convicted, the jury actually hung on that count, and the court subsequently dismissed it, from what I can tell of the record. The record in some of these instances gets a little unclear, but that's what I can tell. The jury actually hung on that. Well, let me ask you this. Yes. What additional evidence would the government have been able to proffer beyond what was already in the trial record that would have addressed the foreseeability as to defendant lie? The foreseeability as to defendant lie, I don't know that we would have been able to proffer anything on her. Anything more. That's correct. Because it was a resentencing where this district court judge, I mean, this was a 17-defendant case with another related case. This district court judge lived this case for a number of years, and he presided over the trial. We had the evidence we pulled out to show him from the trial. He had actually imposed the enhancements earlier. The only question was, had he imposed them to the point where he was clear and convincing? What is the requirement on the district court to articulate the reasons for all the findings and the evidence in support of all the findings? Well, in terms of the 3553A, we certainly cite a case law that shows that he doesn't have to enumerate them. In terms of the guidelines, it's clear under Cantrell and I think Menaweather and Kimbru and those cases that are fairly recent in this court that the district court does have to make guideline findings, and he has to show how he got there. This record, given the fact that there's also the 1999 record, is very complete. The district court didn't do a few things. Like, for instance, when he was done taking off the one level for loss due to the stipulation, he didn't go back and say, I think he went back and said, this makes it six levels. But he didn't then say, that brings us down to 32. You know, he didn't do all those things, but I'm not aware of any particular case that says he necessarily has to, if it's clear to you all and it's clear to the reviewing court on the record what he did. Why? Why? Isn't this issue one of the questions that's pending before the Supreme Court in these two cases that we're on? Zavala? Yes. Well, our case is Zavala, but the two cases in the Supreme Court are from other circuits. That are up on review? Yes, sir. As a matter of fact, and please forgive me for this. I'm a trial attorney. I'm not an appellate attorney. I know that. And I know that the people in our appeals section would be rattling off all these things. I am aware of those cases, though. And as a matter of fact, in speaking with our appellate section, they were of the opinion, this case was actually taken off and recalendered on the Courts on Motion twice. And it was originally set in December. I should say the argument. And then it was reset, I believe, in January. And then we were reset for March. And the appellate section was actually very surprised that it wasn't either reset again or ordered submitted. Only because they thought that this Court was waiting to hear what the Supreme Court is going to do with that opinion. Of course. Why do we need to wait, though? I mean, the issue here really is as to the reasonableness of the sentence. That's what the Supreme Court is looking at. And how far does the district court have to go in articulating the bases for the sentence? Does the guidelines provide a place to start or? Right. Well, my understanding, and you know this one better than I do, Your Honor. But my understanding of what's at. When it comes to sentencing. Well, my understanding of what's up is more this whole thing that's been going around the country as to whether or not a guideline sentence is presumptively reasonable. That's what I'm saying. I'm not sure. I think the answer to Judge Wilkins' question is we may not have any further enlightenment than we currently have with regard to individual factors like foreseeability that drive the initial guidelines. I think that you're right on that. And actually, that was the conclusion that my appellate section did reach when they tried to explain what I was going to have to go talk about here. And the fact that it is a guidelines case. But you know, it's really not. Because this judge, I can stand up here and argue and answer any questions, and I'm happy to in the brief speak to the fact that it's the government's position that this guidelines sentence was properly calculated and that the necessary findings were made by a district court who was extremely familiar with the record. But once we get past that, what this district court did is he then, he didn't even do a formal departure from 188, which would have been the bottom of the guidelines for what he came up with, to 180. He said, look, and he kept trying to get me to put aside the so-called guidelines. I don't know if you can notice that from the record. And I, of course, am thinking, no, we have to make these guidelines decisions. But Judge Hatter is very, always very preoccupied with fairness. And what he was doing here is he was basically saying, look, I'm going to give you 180. And you're really lucky we are where we are because I can set aside these guidelines. And I'm going to. And I can consider everything that you briefed me on. Maybe he didn't specifically say, like, your family circumstances. He did say, like, your rehabilitation. He named a few of them. But I can do all this, and I'm going to do this, and I'm giving you 180 months. And the ---- And he also, responding to Ms. Bedernowski's argument, that in terms of proportionality of the sentence in comparison with the other previously sentenced co-defendants who had cooperated and testified, they got substantially less than 180 months. Yes, sir, they did. And he did respond to that. And he said that shows the value of cooperation. And it wasn't clear to me in reading Ms. Bedernowski's briefs, and I certainly don't blame her for this because this record is very hard to wade through, but I attempted to do it. Well, she wanted the same deal they got. She wanted the same deal they got. But, you know, these ---- and it's on page 23 of the opening brief. And I apologize. I'm terrible with these names, so I'm just going to use the last name. Nguyen, who got the 51 months, who went to trial with the defendant, the jury hung on him, and he was sentenced in 2001 on a C plea. It used to be the old E1C, but now the C1C, the binding plea agreements. His situation was nothing like this defendant who was convicted at trial. As a matter of fact, he was sentenced very late in the game after his case in the Northern District was dismissed. So there were clearly some issues. I don't know what they were. I wasn't even in ---- Kennedy, I wanted to ask you this question, because we talked about foreseeability. You seem to assume that foreseeability is necessary. Is that correct, that this not only has to be the actual loss, but it had to have been foreseeable? I actually was asked this earlier, and there seemed to be a little bit of a split of opinion in the appellate section as to whether or not we actually do have to prove reasonable foreseeability as to a specific amount of loss. Well, 2B3, the guidelines are, you know, almost as confusing as immigration rules. 2B3.1 says under robbery that you get an increase if any victim sustained ---- No, that's a bodily injury one. The one on loss says, here it is. If the loss exceeded blank, increase the offense level as follows. That's 2B3.1b7. Okay. Yes, sir. I have a vague recollection. But the discussion seems to be about a different section, which is 1A, whatever it is. Actually, I think it's 1B1.3. Yes, 1B13a1. Well, the relevant ---- I think I can answer the question. It's the relevant conduct. And that says that you include within relevant conduct anything that's foreseeable. Yes, sir. I certainly don't have to read necessarily, read the two things, saying that it has to be actual and foreseeable. Maybe you could, I suppose. But I'm asking what the government's position is. Is its position that it has to be both actual and foreseeable? If defendant were convicted of the senton robbery, the government's position would have clearly been that under the guideline that Your Honor quoted first, we would not need to show reasonable foreseeability, not one whit. Because the jury hung on that count and the district court, in accounting for that loss, sucked it in under the relevant conduct provision, it's our position out of an abundance of caution that the district court should have and did find it. Does that help, Your Honor? No. Could I just briefly address Judge Tallman's question to Ms. Bednarski about what was appealed below? I happen to have fortuitously pulled that brief, because of course it wasn't me. And actually, they did in the original appeal, appeal the sufficiency of the evidence as to both counts of conviction and the elements of those counts. And it was affirmed. So it was an unsuccessful appeal. I'm not quite sure how that helps. It was just Judge Tallman's question as to what was necessarily covered by that appeal. They didn't have to prove there was a gun or a tie or a particular loss amount. Also, well, we would have had to prove, and the appeals court apparently found that we did, that the defendant knowingly intended to take money or property from another person against their will, and that in doing so he intended to use or And that was my point in answering His Honor's question as to whether some of this and at least some of the arguments that come from the restraints and guns may have been already broached and rejected. So I did want to address that one point. Thank you. Does the Court have any more questions? No. Thanks very much. Thank you very much. Thank you. I think this is On the foreseeability question, I absolutely think they have to prove foreseeability because of the 1B1.3. But isn't that really intended to address, in the conduct of a conspiracy, Pinkerton liability? Isn't that what that phrase references? It's no different than any other. In a conspiracy count, the question is always whether or not it's fair to tag members of a conspiracy for conduct that may not have been reasonably foreseeable, given the scope of the conspiracy and what they thought they were joining. Right. Isn't that what that provision is intended to implement? It's intended to make sure that that analysis is done. And I also believe it's connected to the idea that it's a requirement that the Court make findings specific to the scope of the agreement and tying that to foreseeability. And I guess we're sort of right back to where we started half an hour ago, and that is, you know, how can we overturn Judge Hatter's determination when he rules that, based on the evidence that was before him, by clear and convincing evidence that the ties and the guns were reasonably foreseeable by law? Well, I think you can Or the money. Or the money. I think you can overturn it on the money because he didn't make the required findings and he has to do it. Required by what? Required by the case law that talks about when you attach an enhancement or an adjustment, I'll call it, in a conspiracy to someone that makes him responsible for a broader scope. The extent of the findings, you have to, like, address it, say what the evidence is. I think that the Court has to say this is what I think the nature of his agreement was. This is what I believe. He may not have to use these exact words, but he has to discuss, like, the scope in some fashion. Like, as if to say he was knowledgeable about the, you know, entire scope. Is that true in light of the stipulation?  I have a completely different version of the stipulation. Why is that not surprising? Because the context in which the stipulation is reached is all about whether Centon did an inventory for purposes of insurance. And they, in August You were going to take the adjuster or the representative head on if he had testified as to whether it was really $9.8 million or that's what you blew by the insurance company. And that's why the discussion at the hearing that precedes the stipulation is about we don't know what method he used. We don't know how they arrived at that. And the judge says something to me like, well, don't you think an insurance company is going to be even harder on them than you are? And so it was really about They're not known for paying out three times the amount of the claim if they don't have to. I suppose that was the reason why the judge said, you know, sort of that's probably a pretty good number. But the question had always been about Mr. Van Lismore's limited role in this conduct. Why should he be tagged at 14 levels higher? Why should he get a sentence three times higher than persons similarly situated? Not all of those persons were cooperators. So you'd agree that that is a cooperation would be a legitimate rationale for imposing a higher sentence? I think some of the two, I think two of the people who got sentences in the range of 50 to 60 months, which is exactly where I think the guidelines were in our case, were cooperators. And I think that was a legitimate basis for Judge Hatter to believe they should have gotten a lower sentence. But a couple of other ones that I mentioned in my brief were the government conceded similarly situated to lie. They were not cooperators. They were people who went to trial and were convicted. And their sentences in the 50s and 60s, which is, in ours, it's triple of that. So the way in which we get to the triple range is in part criminal history, and I can't compare my criminal history to theirs. I can't. We don't know what the criminal history was of the other defendants. And in part, because although you started at 20, you go up six levels for a robbery he wasn't convicted of, sent on, the loss amount. You go up six levels for guns and restraints. You know my position on that. And another two for the restraints. So you get to a 34, and then Judge — What about the grouping points? There could have been two more for grouping. Yeah. I would have, had that happened, I would be here arguing that the multiple enhancements overstate the offense. I never got to my second argument, but I don't think — I think it was briefed. Essentially, I believe that he gave undue weight to the seriousness of the offense. I think that's what drove the sentencing. I don't think that he gave reasonable consideration or the consideration he had to, to all of the 3553 factors. Well, that's my question, though. In the end, it was a non-guideline sentence. In the end, whatever he may have thought about the guidelines, he gave the sentence that he thought was reasonable under 3553 with a great knowledge of the case and the defendant. But I don't think you can — you can't separate it from his incorrect calculations of the guidelines, because he keeps talking about, you know, it was 360 and I gave him 20, and the 360 was the guideline calculation, right? Then it came back on the resentencing. And he's like, well, but I'm not giving him 20. I'm giving him a break. If you tie it to an incorrect calculation, then coming down from that is not a fair sentencing. But aren't you ignoring his statement that, you know, you're a lucky man, Mr. Lye, because now you're back here on a remand from the Ninth Circuit and the law has changed. And now I can give you a sentence that I think he didn't use the word reasonable, but now I can give you a sentence free of the constraints of the guideline that I couldn't give you before. Clearly he knew that he didn't have to give an in-range sentence. But what I think he had to do beyond that was not just consider, okay, I can look at the guidelines and then do something else, but he had to look at all of the 7, 3, 5, 5, 3 factors. And my position is when you look at each of those factors, they were not all looked at, and that, in fact, what occurred is he gave undue weight to seriousness of the offense and incorrect, in my view, guidelines. And then he gave short shrift to rehabilitation. I would have to concede in some fashion he considered that because he mentioned it. He gave family support, right? He talked about that too. He talked about family support almost as in good luck when you get out there. I hope you're okay. But it was hard for me to tell if he considered it in terms of nature and characteristics of a defendant in a mitigation context, which is what he has to do. I mean, I think it was almost as if. Well, of course, doesn't it get back to the seriousness of the offense? I mean, you may have the best family in the world, but if you're involved in high-end robberies involving huge losses, I mean, this is not a 7-Eleven string of robberies. And that's why the accurate calculation of the guidelines matters so much because. . . He didn't say, Judy, I'm going to go through a mechanical exercise of calculating these guidelines, but it doesn't really matter to me what they say because I'm going to give you a fair sentence. Did he say that? No. That was the right answer. That was the right answer. You're going to ask me for a game. I know. I mean, it's troublesome, the whole concept of the law about what we're requiring with the guidelines. We're very. . .we do require the district attorneys to make a correct calculation of the guidelines. And then where we go from there, I guess, is something that's being considered in our own bank cases. But if a judge actually said, well, now I've complied with your orders, and if I made a mistake in it or I didn't, it doesn't matter because I'm not really going to be influenced by that. I'm just going to give you what's a fair sentence. I don't know what we'd do. Well, I think what makes it. . . If we think that they're going to be influenced by the calculations they make or we wouldn't force them to do it. It's one of the seven, so they certainly have to consider it, but there's no presumption that should be attached to it. I think that's what Zavala is all about is that it's really up in the air. Is there a presumption of reasonableness? And I would say it's not the law in our circuit. I think in terms of the calculation of the guidelines, if someone starts out with a mindset that, well, it looks like it's 32, but that seems too high, that seems to unfairly drive sentencing, that if they properly did it and they thought, which is my position, it should be a 21. I know you disagree with me on guns and restraints. But even if you went with a 29, which is the difference in the loss amount, subtracting out the cent on loss amount, then you're already below 180 months. You know, your opponent seems like a nice young lady. Why don't you, after this is over, go talk to her about settling it for 29? She'd have to talk to Judge Hatter, too. Yeah, there's a missing party here. It would probably help me in that regard if you were all unanimously suggesting that. We'll keep that in mind. What is the guideline calculation without the loss amount? 29. And what that results in is lower than 180 months. At a level 5, it's 140 to 175. And that's before any departures or other mitigating factors. Thank you. Did you have a good question? No.  Thank you very much. Thank you. The case just argued will be submitted.
judges: Reinhardt, Tallman, Wilken